**Ana L. CAUSSADE, Plaintiff,**

v.

**Jesse BROWN, Secretary of the United States Department of Veterans Affairs, Defendant.**

**Civil No. 95–397.**

United States District Court, D. Maryland.

April 30, 1996.

Lawrence J. Sherman, Deso, Thomas & Rost, Washington, DC, James L. Kestell, Kestell & Associates, Falls Church, VA, for plaintiff.

Lynne A. Battaglia, U.S. Attorney, Allen F. Loucks, Asst. U.S. Atty., Office of the U.S. Attorney, Baltimore, MD, for defendant.

## MEMORANDUM OPINION

DAVIS, District Judge.

Plaintiff, Ana L. Caussade, R.N. ("Caussade"), a supervisory nurse at a veterans' medical facility, filed a complaint against Jesse Brown, Secretary of the Department of Veterans Affairs ("the V.A."), alleging discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Pending before the Court is defendant's *motion for summary judgment.* The motion raises two basic issues: (1) whether plaintiff can establish a *prima facie* case under ADEA and Title VII, specifically, whether Caussade suffered an "adverse employment action" in consequence of a series of reassignments that ultimately resulted in her permanent assignment to a smaller hospital unit; and if so, (2) whether plaintiff has presented sufficient evidence to generate a genuine dispute of material fact as to whether defendant's alleged nondiscriminatory reasons for the reassignment are pretextual. No hearing is necessary.

For the reasons that follow, I conclude as a matter of law that the answer to each of these issues is "no," and therefore I shall grant the motion for summary judgment.

(i)

 Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11. This burden "is particularly strong when that nonmoving party [also] bears the burden of proof." *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990). The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of

one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). *See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds*, —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a motion for summary judgment is made and supported as provided in [rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512; *Shealy*, 929 F.2d at 1012. Furthermore, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587–88, 106 S.Ct. at 1356–57; *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

(ii)

I shall set forth the facts in the light most favorable to Caussade's contentions. Caussade is a 61–year–old registered nurse who was born in Puerto Rico. In 1967, she moved to the United States and began her employment as a staff nurse in the psychiatric ward of the V.A. Medical Center in Perry Point, Maryland. During her career at Perry Point, Caussade occupied myriad posts, some entailing solely clinical responsibilities, some purely managerial, and some encompassing both types of responsibilities. In 1971 Caussade received a promotion to Head Nurse of a ward in the Nursing Home Care Unit ("NHCU"). Between 1973 and 1975, Caussade also served temporarily as a staff nurse in the Intensive Care Unit ("ICU") and in administrative positions, such as Evening Coordinator and Acting Chief Nurse. In 1975 Caussade became Head Nurse of a psychiatric ward.

In 1977 Caussade received a promotion to Supervisor of the NHCU. As Supervisor, Caussade managed the administrative functions of the two head nurses in charge of wards 9A and 9B, the two NHCU wards. After completing her master's degree in Science Administration in 1984, Caussade's title was changed to Associate Chief, Psychiatry, NHCU, but her duties remained the same.

In 1988, M. Sandra Bourbon, R.N. ("Bourbon"), an American-born Caucasian female who is one year younger than Caussade, was appointed Chief Nurse of the medical center, and thereby became Caussade's immediate supervisor. During her first year as Chief Nurse, Bourbon relied heavily on Caussade to accomplish administrative and clinical tasks and, on many occasions, to cover for other supervisors who could not perform their assignments. After a year or so of working closely (and satisfactorily) with Bourbon, Caussade began noticing changes in Bourbon's "attitude" toward her. Plaintiff alleged that, at administrative meetings for example, Bourbon would often question her professional competence and would make disparaging comments about her Hispanic accent in front of other staff.

In June 1989, Bourbon relieved Caussade of her supervisory responsibilities over ward 9B and assigned Susan Joslin, R.N. ("Joslin"), an American-born Caucasian female in her early thirties, to supervise the ward. After six weeks of apparently mediocre to poor performance (which Caussade had predicted), Joslin decided to transfer into another practice area and left ward 9B. Caussade contends that Bourbon formed the belief (erroneous in fact, according to Caussade) that Caussade had facilitated Joslin's failure as a supervisor. Bourbon threatened revenge. In any event, Bourbon reassigned Caussade to supervise the two NHCU wards, 9A and 9B. Apparently, during this period and throughout the remainder of Bourbon's tenure at the medical center (she is no longer assigned to Perry Point), Bourbon would pester Caussade with questions about when Caussade would retire, and she told other supervisory nurses that she wished Caussade "would retire so someone with new blood could be put into her position." Def.'s Mot.

Supp.Summ.J., Ex. 17, Betty Kupp's Dep. at ¶ 4.[1]

In addition to performing her duties as Associate Chief Nurse of NHCU, Caussade also served as Acting Associate Chief Nurse for numerous other units, e.g., Outpatient Clinic and the medical unit. In December 1991, based on Caussade's outstanding performance, and notwithstanding the deterioration of their professional relationship, Bourbon recommended Caussade for a promotion from GS–12 to GS–13, which increased Caussade's salary to a Chief Nurse grade. Bourbon also appointed Caussade chairperson of a hospital committee.

In September 1992, however, for what Caussade contends are discriminatory reasons, Bourbon relieved Caussade of her responsibilities in the Ambulatory Care Service Unit and in ward 9A of NHCU. Bourbon assigned Kay Evans, R.N., a 39–year–old American-born Caucasian female, to supervise ward 9A. Caussade retained her responsibilities over ward 9B of NHCU and also became the Associate Chief Nurse of ward 23B of the Long Term Care Unit ("LTCU"). Caussade's responsibilities in ward 23B (which served terminal patients) involved, *inter alia*, effecting a plan to convert it into a ward of NHCU.

In April 1993, again for what Caussade contends were discriminatory reasons, Bourbon relieved Caussade of her remaining responsibilities for ward 9B of NHCU and assigned her to ward 23B exclusively. As a result of the reassignments and a series of publicly humiliating encounters, Caussade began suffering from high blood pressure, high anxiety, headaches, insomnia, hypertension, low self-confidence and low self-esteem. She continues to see a physician for treatment of these symptoms.

Consequently, in April 1993, Caussade filed an informal complaint with the Equal Employment Opportunity Commission ("EEOC"), challenging her reassignment to ward 23B. According to Caussade, a "special site committee" was established to investigate her complaint and it determined that she was improperly reassigned.[2] Pl.'s Mem. Opp'n Mot.Summ.J. at 15. In June 1993, Caussade filed a formal EEO complaint of discrimination.[3] In February 1995, Caussade filed her complaint in this Court based on the first charge of discrimination.

(iii)

ADEA's prohibition of age discrimination, 29 U.S.C. § 623(a)(2), provides:

> It shall be unlawful for an employer—(2) to limit, segregate, or classify his employees in any way which would deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age[.]

Section 717(a) of Title VII, 42 U.S.C. § 2000e–16(a), prohibits discriminatory employment practices by the federal government:

> All personnel action affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any

---

1. Bourbon contends that Caussade had expressed a desire to "take it easy" in anticipation of her approaching retirement, but Caussade denies making such statements. For purposes of the pending motion, I credit Caussade's denial.

2. Caussade's Memorandum in Opposition to Defendant's Motion for Summary Judgment alludes to an "Exh. 5," which presumably was intended to be a copy of the "findings" of this "site committee." No such Exhibit was attached to the Memorandum.

3. While that complaint was pending, Caussade filed another complaint alleging that she received a "low satisfactory" annual evaluation from Bourbon in retaliation for filing the first discrimination complaint. In October 1994, the parties settled the second complaint, *inter alia*, by changing the performance rating to a "satisfactory" rating. Accordingly, there is no retaliation claim asserted in this case.

Nevertheless, days before defendant filed its motion for summary judgment, Caussade moved for leave to file an amended complaint. The gravamen of the claims added in the proposed amended complaint is that Caussade's right to privacy under the Privacy Act of 1974, 5 U.S.C. § 552a *et seq.*, was violated when certain documents from her personnel file were copied and provided to Bourbon, presumably in anticipation of defending this action. In view of the disposition of the motion for summary judgment, the motion to amend shall be denied without prejudice.

discrimination based on race, color, religion, sex, or national origin.

In order to prevail on an ADEA or Title VII claim,[4] a plaintiff must prove that "but for the employer's motive to discriminate against the employee because of the employee's age [or national origin], the employee would not have suffered the [adverse employment] action." *Tuck v. Henkel Corp.,* 973 F.2d 371, 374 (4th Cir.1992), *cert. denied,* 507 U.S. 918, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993); *see Sailor v. Hubbell, Inc.,* 4 F.3d 323, 326 (4th Cir.1993). A plaintiff may prove her case in one of two ways. First, she may rely on direct evidence or indirect evidence of sufficient probative force to support an inference of discrimination. *Goldberg v. B. Green and Co.,* 836 F.2d 845, 847–48 (4th Cir.1988). Second, she may prove her case of intentional discrimination by using the burden-shifting proof scheme originally formulated for Title VII cases, *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and subsequently adapted for ADEA cases, *see Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 239 (4th Cir.1982). Here, Caussade attempts to prove her ADEA and Title VII claims under the judicially-created proof scheme.

The *McDonnell Douglas* proof scheme places the initial burden of production on the plaintiff to make out a *prima facie* case of discrimination by establishing that (1) the employee was a member of the protected group, i.e., over the age of 40 or foreign born; (2) she suffered an adverse employment action; (3) she was at the time meeting her employer's legitimate expectations; and (4) she was replaced by someone younger or outside the protected group. *See Williams v. Cerberonics, Inc.,* 871 F.2d 452, 455 (4th Cir.1989); *see also O'Connor v. Consolidated Coin Caterers Corp.,* —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (replacement worker must be substantially younger than the plaintiff); *Jiminez v. Mary Washington College,* 57 F.3d 369, 383–84 (4th Cir.), *cert. denied,* —— U.S. ——, 116

S.Ct. 380, 133 L.Ed.2d 304 (1995) (national origin discrimination case). This initial showing requires the plaintiff to produce "a set of facts which would enable the factfinder to conclude with reasonable probability that *in the absence of any further explanation,* the adverse employment action was the product of age [or national origin] discrimination." *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1315 (4th Cir.1993) (emphasis in original).

Once the plaintiff establishes a *prima facie* case, a presumption of discrimination arises and the burden of production is placed on the employer to articulate a legitimate nondiscriminatory reason for the adverse employment decision. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–08, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (citing *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). Because the employer's burden is one of production and not of persuasion, he "is not required to prove absence of a discriminatory motive, but merely articulate some legitimate reason for its action." *E.E.O.C. v. Clay Printing Co.,* 955 F.2d 936, 941 (4th Cir.1992) (quoting *E.E.O.C. v. Western Electric Co. Inc.,* 713 F.2d 1011, 1014 (4th Cir.1983)). If the employer meets this burden, the presumption of discrimination is eliminated, and the plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the employer's nondiscriminatory reasons are pretextual and that the adverse employment action was actually taken because of the employee's age or national origin. *Hicks,* 509 U.S. at 510–12, 113 S.Ct. at 2749.

(iv)

The V.A.'s principal contention is that Caussade is unable to establish a *prima facie* case of age or national origin discrimination because she has not suffered an "adverse employment action" within the meaning of ADEA or Title VII. The V.A. maintains that Caussade's reassignment to Associate Chief Nurse of ward 23B of LTCU was merely a

---

4. As the relevant provisions of ADEA are patterned after Title VII, courts have applied Title VII analysis to ADEA claims. *See Fuller v.* *Phipps,* 67 F.3d 1137, 1144 n. 4 (4th Cir.1995); *see also Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 n. 10 (3d. Cir.1994).

lateral transfer which had no adverse affect on her grade, title, salary or level of responsibility. Caussade contends, however, that she suffered cognizable adverse employment actions when: (1) "she was relieved of her duties in wards 9A and 9B" of NHCU; (2) "she had her office taken away from her;" (3) she "had to work out of the trunk of her car to perform her duties until she found underutilized space" elsewhere; (4) Bourbon made demeaning comments to third parties about plaintiff's age and accent; and (5) her "demonstrated record of performance and her skills and abilities were openly disparaged." *See* Pl.'s Mem. Opp'n Mot.Summ.J. at 10.

1.

The "employment discrimination laws require as an absolute precondition to suit that some *adverse employment action* have occurred." *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986) (emphasis added); *see Lovelace,* 681 F.2d at 239–41 (plaintiff must have "suffered an unfavorable employment action"). In defining what constitutes an adverse employment action, the Fourth Circuit observed, in *Page v. Bolger,* 645 F.2d 227 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981), that inquiries into whether there has been employment action affecting an employee have "consistently focused on the question whether there has been discrimination in what could be characterized as *ultimate employment decisions* such as hiring, granting leave, discharging, promoting and compensation." *Id.* at 233 (emphasis added).[5] *See e.g., Hopkins v. Baltimore Gas & Elec. Co.,* 871 F.Supp. 822, 836 (D.Md. 1994), *aff'd,* 77 F.3d 745 (4th Cir.1996); *Lucas v. Cheney,* 821 F.Supp. 374, 375 (D.Md. 1992), *aff'd,* 991 F.2d 790 (4th Cir.1993). The Fourth Circuit further stated:

> Among the myriad of decisions constantly being taken at all levels and with all degrees of significance in the general employment contexts covered by Title VII there are certainly others than those we have so far specifically identified that may be so considered, for example, entry into training programs. By the same token, it is obvious to us that there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscription of § 717 and comparable provisions of Title VII.

*Id.* at 233 (citation omitted). The Fourth Circuit cautioned, however, that it "suggest[s] no general test for defining those 'ultimate employment decisions' which alone should be held directly covered by § 717 and comparable antidiscrimination provisions of Title VII." *Id.*

Some district courts have interpreted *Page* as standing "only for the proposition that where the effects of the adverse action have not yet been felt by the plaintiff, the action is mediate and therefore does not constitute employment action." *Howze v. Virginia Polytechnic,* 901 F.Supp. 1091, 1097 (W.D.Va. 1995); *see Jensvold v. Shalala,* 829 F.Supp. 131, 136–37 (D.Md.1993). The district court in *Howze* added that the term "adverse employment action" also "includes actions that would adversely affect one's professional reputation or ability to gain future employment, whether or not there was an ultimate employment decision." *Id.* at 1097 (citing *Nelson v. Upsala College,* 51 F.3d 383, 387 (3d Cir.1995); *Passer v. American Chem. Soc'y,* 935 F.2d 322, 331 (D.C.Cir.1991)).

In cases involving transfers, as in the present case, courts have held that absent a change in title, compensation, responsibility or working conditions, a mere transfer does not amount to adverse employment action. *See Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994) (reassignment without diminution of "title, salary or benefits" insufficient to establish adverse action); *Spring v. Sheboygan Area School Dist.,* 865 F.2d 883, 885–86 (7th Cir.1989) (no adverse employment action where elementary school

---

**5.** Caussade's heavy reliance upon *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), and *Harris v. Forklift Systems,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), is misplaced since she has not alleged in the instant case a "hostile environment" claim under either ADEA or Title VII.

principal was transferred to a dual principal-ship over two elementary schools).

In *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132 (7th Cir.1993), for example, the Seventh Circuit found no adverse employment action when a bank branch manager became a collections officer at another branch while retaining the same salary and benefits. *Id.* at 135–36. The circuit court held that

> a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Id.* at 136.

Additionally, in *Darnell v. Campbell County Fiscal Court*, 731 F.Supp. 1309 (E.D.Ky. 1990), *aff'd*, 924 F.2d 1057 (6th Cir.1991), the court noted that "a transfer involving loss of prestige or an objectively demeaning change of working conditions can amount to adverse employment conditions." *Id.* at 1313; *see also Kauffman v. Kent State Univ.*, 815 F.Supp. 1077, 1082–85 (N.D.Ohio 1993), *aff'd*, 21 F.3d 428 (6th Cir.1994). Outside the Title VII context, the Eleventh Circuit recently held, in *McCabe v. Sharrett*, 12 F.3d 1558 (11th Cir.1994), that an employee had suffered adverse employment action where she was transferred to a position which had fewer responsibilities, more menial tasks, and little opportunity for future salary increases. *Id.* at 1564; *see also Collins v. State of Illinois*, 830 F.2d 692, 704 (7th Cir.1987).

### 2.

■ Mindful of these admittedly inexact standards, I am persuaded that the record of the instant case establishes that Caussade suffered no cognizable adverse employment action when she was assigned full-time to ward 23B of LTCU. It is undisputed that she retained her title, grade, salary and benefits. Although Caussade claims that she was relieved of her "principal managerial

responsibilities," Caussade does not point to one specific lost responsibility. In fact, based on Caussade's testimony on deposition, she is presently performing duties quite similar to those responsibilities she previously performed in NHCU, and furthermore, she is enjoying her work. Caussade's (7/21/95) Dep. at 58–59. Specifically, as she was previously, Caussade is presently responsible for implementing higher standards of patient care, developing performance standards for the professional staff, and designing a reporting system. *Id.* at 231–37.

In essence, Caussade's contention that her reassignment constitutes adverse employment action seemingly is based on quantity not quality. Caussade contends that she has suffered adverse employment action because the number of wards or units to which she is assigned has been decreased from three to one. She does not contend that the value of her duties has materially changed or that she is overwhelmed with or deprived of work. Plaintiff's claims fail because the inquiry to determine adverse employment action is not a "numbers game," but is a substantive analysis of the relative quality of the work presently assigned to her compared to her prior duties. In this case, the record is bereft of any evidence suggesting that there has been any material change in Caussade's duties or responsibilities. To the contrary, the 1993 reassignment is of a piece with Caussade's eclectic career pattern at Perry Point. Nor has plaintiff alleged any material loss of prestige or a reduced opportunity for future reassignments or salary/grade increases. A transfer or reassignment alone does not amount to adverse employment action. *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 n. 6 (9th Cir.1994) (a transfer is barely "adverse" where employee was not demoted, or put in a worse job, or given any additional responsibilities), *cert. denied*, —— U.S. ——, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995). *Cf. Dominic v. Consolidated Edison Co. of New York, Inc.*, 822 F.2d 1249, 1254–55 (2d Cir.1987) (employee showed adverse employment action where he was transferred to area with poor working conditions and deluged with work).

### 3.

■ Apart from her actual reassignment to exclusive supervision over ward 23B, the other alleged indicia of discriminatory treatment do not, as a matter of law, amount to "adverse employment action." Caussade contends that Bourbon made disparaging statements about her age and Hispanic accent in front of others. Distasteful verbal comments, though indicative of discriminatory animus, *see Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1265 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994), do not amount to adverse employment actions when they do not become a part of the employee's employment file, *see Lucas,* 821 F.Supp. at 376. Moreover, the public humiliation plaintiff experienced is not significantly probative of age or national origin discrimination because "public perceptions [are] not terms or conditions of [her] employment." *Crady,* 993 F.2d at 135 (internal quotation marks and citations omitted). *See infra* n. 6.

### 4.

■ Caussade contends that she suffered adverse employment action when Bourbon prohibited her from entering ward 9A after her reassignment. As a consequence of that verbal order, Caussade was unable to retrieve her belongings from her old office, was left without an office for several months, and was forced to work out of the trunk of her car. Here, the only "action" attributable to Bourbon or any agent of the V.A. is the alleged order forbidding Caussade from entering the floor of ward 9A. That "action" alone does not constitute "adverse employment action" because Caussade was no longer assigned to ward 9A and therefore any prohibition on her presence there did not affect the terms and conditions of her employment.

■ Claims of age and national origin discrimination require proof of intentional acts of discrimination. Caussade's assertion that Bourbon's order *resulted* in her inability to retrieve her belongings and forced her to work out of her car trunk does not constitute evidence of intentional discriminatory action. As a matter of law, it was not reasonable for Caussade to infer from the order to remain away from ward 9A that Bourbon intended that plaintiff must work out of her car trunk.[6] Caussade has not alleged that an agent of V.A. had knowledge that she was "working out of the trunk of her car," which is not defined by Caussade in her papers. Although Caussade, as the nonmoving party, must be afforded the benefit of all reasonable inferences, it is not reasonable on this record to impute such knowledge to Bourbon. Even if Bourbon was aware of these circumstances, however, her failure to fashion a remedy does not equate to an adverse employment action under the above-cited caselaw.[7] Therefore, plaintiff has failed to prove that she suffered adverse employment action. Accordingly, plaintiff has failed to establish a *prima facie* case of age or national origin discrimination.

---

**6.** In the absence of a claim for "hostile environment" discrimination, Caussade's complaints about the disrespect and humiliation she suffered seemingly sound in tort; they do not constitute cognizable claims of discriminatory treatment resulting in adverse employment action. State law claims such as intentional infliction of emotional distress generally do not lie against supervisors in the federal employment context presented here, although the evolving law in this area remains somewhat uncertain. *See Jamison v. Wiley,* 14 F.3d 222, 226–228 (4th Cir.1994) (procedural, jurisdictional and substantive issues *sur* immunity of federal employees); *Rallis v. Stone,* 821 F.Supp. 466, 470–72 (E.D.Mich.1993) (claims for "age harassment" and intentional infliction of emotional distress). This observation is not meant to suggest that such a claim has been made out; the contrary is true. *See Bryant v. Better Business Bureau of Greater Md., Inc.,* 923 F.Supp. 720, 746 (D.Md.1996); *Brumback v. Callas Contractors, Inc.,* 913 F.Supp. 929, 943–46 (D.Md.1995).

**7.** According to Caussade, when she mentioned the issue of office space to Bourbon, the latter described the issue as "[Caussade's] problem." *See* Caussade's Aff. at ¶ 11. In fact, Caussade resolved the problem by converting space in the very ward over which she exercised supervisory and management authority. Thus, it is difficult to see how, even viewing the facts in the light most favorable to Caussade, such discourtesies (rather easily overcome by Caussade without input from Bourbon), rise to the level of an "adverse employment action" for which relief is available under the antidiscrimination laws.

## (v)

■ Assuming that Caussade has made out a *prima facie* case of discrimination, plaintiff's claim would nevertheless fail because defendant has produced several legitimate, nondiscriminatory reasons for Caussade's reassignment. · Defendant's primary reason is that plaintiff's reassignment was part of an overall, on-going reorganization of the nursing department. The psychiatric nursing services at the medical center upon Bourbon's arrival were so outdated that specific criticisms of it had been noted by accreditation authorities. Caussade essentially, if not enthusiastically, agreed with Bourbon that a great deal of work was required to modernize the service delivery system. As conceded by Caussade, Bourbon's demonstrated ambition to improve the quality of patient care in the nursing department resulted in numerous personnel changes. As Caussade specifically conceded on deposition, Bourbon hired, promoted and discharged employees of different ages and ethnicity. Moreover, in September 1992, when Caussade was relieved of her duties in ward 9A, seven head nurses of different ages and ethnicity were given new assignments. Caussade's (7/21/95) Dep. at 17–24. In sum, the reorganization was real, not merely illusory.

In addition to the undisputed evidence of the existence of an overall scheme of reorganization, defendant has proffered a litany of facially legitimate reasons pertaining to Caussade's "performance" as Associate Chief Nurse of NHCU for her reassignment in April 1993:

(1) a general doubt of Caussade's ability to meet performance requirements at her new GS–13 level; (2) plaintiff's failure to

discover that a nursing assistant in NHCU was using drugs and stealing a deceased patient's money; (3) complaints by patients' family members; (4) plaintiff's failure to organize family councils, which are required under hospital standards; (5) plaintiff's delay in reporting that she had found a small amount of money on the ward; (6) plaintiff's reluctance to prepare a proposal requested by Bourbon; and (7) criticism of Caussade by the Geriatric Committee for failing to be responsive. *See* Bourbon's Aff. at 9–14.

In response to this showing, Caussade alleges that the reasons proffered by defendant are pretextual. In her affidavit, however, plaintiff merely challenges defendant's characterization of the above-mentioned reasons and incidents, or fails to adduce evidence to support her own spin on these reasons.[8] That attempt fails as an effort to show that defendant's reasons are pretextual. Also, because Bourbon had earlier recommended plaintiff for a promotion, there is a strong inference that Bourbon's stated reasons are not pretextual. *See Proud v. Stone,* 945 F.2d 796, 798 (4th Cir.1991). In any event, with or without this inference, Caussade does not generate a genuine factual dispute sufficient to preclude summary judgment.

## (vi)

There is no doubt that despite an early relationship marked by mutual respect, reciprocal cooperation and a shared commitment to the enhancement of the professionalism of the nursing operation at the Perry Point facility, Caussade and Bourbon suffered a dramatic estrangement. Ultimately, Bourbon's exercise of legitimate management prerogatives in the reorganization of the

8. For example, Caussade contends that her units received fewer complaints than other units; however, no proof of this statement is tendered. *See* Caussade's Aff. at ¶ 14(b). Also, Caussade contends that family councils were not formed because their role was duplicated by patient councils, and that Bourbon never requested that family councils be formed. *Id.* at ¶ 14(c). Finally, Caussade contends that Bourbon "manipulated" the Geriatric Committee's unfavorable assessment of her, however, she produces no evidence from any member of that committee (or otherwise) to refute the *bona fides* of the com-

mittee's proposed assessment of her performance.

On the overall issue of Caussade's attempt to establish a factual record sufficient to defeat summary judgment, I agree with the V.A. that Caussade's decision to attach wholesale the "Q & A affidavits" generated by the administrative investigation of her claims falls far short of the requirements of Rule 56. *See Dowty Communications v. Novatel Computer Systems,* 817 F.Supp. 581, 595 n. 3 (D.Md.1992), *aff'd,* 33 F.3d 390, 395 (4th Cir.1994).

nursing staff has left Caussade with the firm conviction that she fell out of favor as a result of discriminatory animus based on her age and her national origin. For the reasons I have expressed above, the series of reassignments of Caussade does not translate into "adverse employment action" within the contemplation of the statutory antidiscrimination provisions Caussade relies on here. Furthermore, Caussade's insistence that the reassignments were but calculated steps designed to coerce her retirement or resignation so that she could be replaced by a substantially younger, non-Hispanic person, though sincerely believed by Caussade, are nevertheless unproven on this record. At best, a trial here would establish that Bourbon was an insensitive lout in need of further training in basic civility and effective professional management skills.[9]

In any event, Caussade's recharacterization of the legitimate nondiscriminatory reasons for her reassignments, to give those reasons a patina of discriminatory action, fails to generate a genuine dispute of material fact. Thus, even if her reassignment were viewed as an "adverse employment action," nevertheless, there was cause for the V.A. to take such action. Accordingly, the V.A. is entitled to judgment as a matter of law. A separate order is entered herewith.

### ORDER

In accordance with the foregoing Memorandum Opinion, it is this 30th day of April 1996, by the United States District Court for the District of Maryland,

1) ORDERED that the Defendant's Motion for Summary Judgment BE, and it hereby IS, GRANTED; and it is further

2) ORDERED that Plaintiff's Motion for Leave to File Amended Complaint BE, and it hereby IS, DENIED WITHOUT PREJUDICE; and it is further

3) ORDERED that the Clerk CLOSE this case.

The Clerk shall MAIL copies of this Order and the foregoing Memorandum Opinion to the attorneys of record for the parties appearing in this case.

---

**9.** Moreover, Caussade may well be correct in her assertion that Bourbon's incivility (accepted as established for purposes of the motion for summary judgment) grew out of Bourbon's hostility arising from her belief that Caussade helped to undermine Bourbon's appointee, Joslin. *See supra* p. 697. If that charge is true, then of course Bourbon's treatment of Caussade, while certainly nonetheless condemnable, was not motivated by age or national origin discrimination.