Dr. Nadwa **RAFEH**

v.

**UNIVERSITY RESEARCH CO. L.L.C.**

No. Civ. JFM99–461.

United States District Court,
D. Maryland,
Southern Division.

Sept. 29, 2000.

Alan Banov, Alan Banov and Associates, Washington, DC, for plaintiff.

Burton J. Fishman, Ogletree, Deakins, Nash, Smoak & Stewart, Washington, DC, for defendant.

## MEMORANDUM

MOTZ, District Judge.

Plaintiff has brought this action under Title VII of the Civil Rights Act of 1964, alleging that she was discriminated against because of her pregnancy. She asserts claims for disparate treatment and constructive discharge. Discovery has been completed, and defendant has moved for summary judgment[1]. The motion will be granted.

### I.

The pertinent facts may be briefly stated. Defendant was a subcontractor on a health care project in Egypt known as the Cost Recovery for Health Project (CRHP). Plaintiff was hired by defendant in 1991 as a research associate and between 1991 and June 1993 worked on the quality assurance project of CHRP. In 1993 she accepted a one-year assignment to work on the project in Cairo and, at defendant's request, extended her term of duty there. She received excellent evaluations and in 1994 received a raise and a promotion.

In May 1995 defendant won a bid from the United States Agency for International Development (USAID) to become the prime contractor for CHRP. In December of that year plaintiff was promoted to a position known as "Task One Coordinator," a position of substantial responsibility on CHRP. In the same month plaintiff learned that she was pregnant with her second child, and in January 1996 she informed her supervisor, Henry C. Reinhard, Jr., of that fact. Reinhard asked her if she thought she would have the energy to do her work while she was pregnant.

Reinhard and the vice-president to whom he reported, David Nicholas, assert that they had reservations about plaintiff's ability to perform the duties of Task One Coordinator at the time they promoted her to that position. They further assert that they became disenchanted with her performance during early 1996. Reinhard began to assume some of plaintiff's responsibilities himself, including holding meetings with technical advisers who reported to plaintiff. Plaintiff alleges that Reinhard, having formed the impression that she would be unable to do her job because of her pregnancy, embarked on a program to undermine her authority and destroy her effectiveness.

In February 1996 USAID issued a midterm evaluation highly critical of CHRP and defendant's performance on the project. Defendant was required to respond quickly to the criticisms in the evaluation. This need continued throughout the spring and summer.

On April 20th plaintiff was hospitalized for two days as the result of an episode of pre-term labor. Her doctor then ordered her to remain in bed for two weeks. Plaintiff indicated to Reinhard that her condition was transitory and that she did not anticipate requiring extended leave. The following day Reinhard sent an email to Nicholas in which he stated: "This latest development [plaintiff's confinement to bed] seems a bit ominous and may suggest

---

1. Plaintiff has filed a motion to file a supplemental memorandum. That motion is granted. Plaintiff has also requested further discovery. Regardless of whether or not that request is timely, the discovery plaintiff seeks does not pertain to the facts I find to be material. Therefore, plaintiff's request is denied.

that she is facing a difficult pregnancy. While I do not wish to overreact, the prospect of repeated prenatal absences and an absence of at least six weeks postpartum are contingencies for which we must be prepared." Later in the email he said: "I am struggling with how to offer her encouragement . . . and at the same time come up with a plan to get the job done as she is potentially less and less able to meet the responsibilities of her position." Testifying about this email on deposition, Reinhard said: "[T]he fact of the matter is I was concerned and my first priority, of course, was her well being, but I also had a project to do." He further stated: "I'm not a medical doctor, but I took it as a bad omen that she was having to go to bed with her pregnancy this early. . . . That may have been an unfounded concern on my part."

On April 23rd plaintiff wrote a memo to Reinhard, informing him that she needed sick leave for three days from April 21 to April 24. (She had already been scheduled to take holiday leave from April 24 to May 4). Reinhard responded by an email in which he asked plaintiff to provide him with her obstetrician's estimate of how likely she would need further bed rest during her pregnancy and about her delivery date so that her needs and "the needs of the project are met in a responsible manner." He added: "Obviously, the first priority must be your health and that of your unborn baby."

On April 30th, plaintiff proposed that she be allowed to work at home for two weeks. She believed she had the ability to work from home because she had a laptop, fax machine, email, and a driver who could transport colleagues to her house for meetings. Reinhard did not agree to her request. On May 5th, plaintiff renewed her request, notifying Reinhard that her doctor recommended that she work from home until June 16th.

On May 6th Reinhard wrote plaintiff a memo in which he advised her that she was being relieved of her responsibilities as Task One Coordinator and that she was

being reassigned back to the quality assurance project. Plaintiff's salary and benefits remained the same. On May 7th the rest of defendant's staff was informed of the reorganization. Apparently because USAID complained that it had not been consulted before the decision was made, implementation of the reorganization was delayed until June 9th. By that time plaintiff had advised Reinhard that she had been told by her doctor that her pregnancy was endangered and that she would not be able to return to work on June 16th as she had previously indicated.

Plaintiff delivered her baby on July 28th. She informed defendant that she would be returning to work on September 1st. She was offered the position of Senior Clinical Quality Assurance Advisor and was to report to the Task One Coordinator. Her compensation and benefits were not reduced but her new job involved fewer responsibilities and was not a management position. She returned to work but resigned in December 1996.

## II.

■ A plaintiff can prove a disparate treatment violation of Title VII under the *McDonnell Douglas* proof scheme using circumstantial evidence. *See* 42 U.S.C. § 2000e ("Title VII"); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff may establish a prima facie case for a disparate treatment claim under Title VII by demonstrating that: (1) the plaintiff is in a protected group; (2) the plaintiff was performing the job satisfactorily; (3) the plaintiff suffered an adverse employment action; and (4) the circumstances gave rise to an inference of unlawful discrimination. *See id.; Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 609 (4th Cir.1999). Satisfaction of the prima facie case creates a rebuttable inference that the adverse employment discrimination was based on discriminatory intent. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Brinkley*, 180 F.3d at 609.

The burden of establishing a prima facie case of disparate treatment is not onerous. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 251, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). However, a plaintiff must establish all four of the elements of a prima facie case to survive a summary judgment motion since such a motion can be based upon the insufficiency of a plaintiff's proof. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ In this case plaintiff has established three of the four elements of her prima facie case. She was a member of a protected group. She also suffered an adverse employment action. Although her salary and benefits were not reduced, her demotion from Task One Coordinator to Senior Clinical Quality Assurance Advisor involved a significant diminution of her managerial responsibilities. This is sufficient to constitute adverse employment action. *See Caussade v. Brown*, 924 F.Supp. 693, 700 (D.Md.1996); *Mackey v. Shalala*, 43 F.Supp.2d 559, 568 (D.Md.1999).

Likewise, in regard to the fourth element, plaintiff has shown, as she is required to do, *see Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir.1996), that after her demotion, she was replaced by someone of comparable qualifications outside the protected class. Her job responsibilities were assumed in part by Tom Hayes, a man who filled a newly defined Task One Coordinator position after the reorganization, and in part by Reinhard himself. Moreover, some of Reinhard's comments about plaintiff can be interpreted as reflecting a stereotypical view that pregnant women are less capable workers who must be protected from stress and who may have poor attendance. *See Geier v. Medtronic, Inc.* 99 F.3d 238, 241–42 (7th Cir.1996); *Troy v. Bay State Computer Group, Inc.*, 141 F.3d 378, 381–82 (1st Cir.1998).[2]

■ Plaintiff has not, however, established that she was performing her job satisfactorily. Plaintiff had been promoted to a management position. Her superiors could properly conclude that an objective requirement of that position was that plaintiff be in the office where she could coordinate the activities of those who reported to her.[3] This was especially true since a critical situation requiring an emergent response had been created by USAID's unfavorable assessment of defendant's performance as the prime contractor on CHRP. Plaintiff apparently believed that she could effectively manage by fax and email and by requiring her subordinates to be driven to her home for meetings and consultation. Perhaps she was right. I hold, however, that as a matter of law an employer may mandate that those in leadership positions come to the office to do their job. On its face that is an entirely reasonable requirement and one dictated by principles of sound management. Of course, if an employer has permitted a manager in a nonprotected class to work from home but has denied that opportunity to a manager in a protected class, it must demonstrate that there is a legitimate, non-pretextual basis for its discrimination.[4] However, absent such evi-

2. Of course, a jury would not be required to so find. They might conclude that while some of Reinhard's remarks were patronizing in tone, they merely reflected a genuine concern for plaintiff's well-being and that he was motivated in his actions by a bona fide evaluation of her job performance and legitimate concerns about the need to prepare an adequate response to USAID's critical report.

3. If this case turned on the subjective qualifications of plaintiff for the position of Task One Coordinator, I would likely follow those courts that have held that the defendant's judgment of those qualifications should be considered at the "pretext" rather than the "prima facie" stage of the *McDonnell Douglas* proof scheme.

4. Likewise, if an employer were to hold open a position for a manager in a nonprotected class who was out because of a temporary disability but not for a manager in a protected class under comparable circumstances, it would have to justify its decision. Again, however, plaintiff here has presented no evidence that this occurred.

dence (and plaintiff has produced none), there is no basis in law or in reason to subject an employer's judgment to second-guessing by a jury. By the time that Reinhard made the decision to remove plaintiff from the Task One Coordinator position, plaintiff had made it clear that she would need to work from home. Thus, regardless of the propriety of Reinhard's subjective views, his action in removing plaintiff from the Task One Coordinator position was objectively reasonable and beyond legal challenge.

## III.

 Plaintiff's claim for constructive discharge is frivolous. Even if it is assumed that she has a viable claim for her demotion, she has presented no evidence proving that defendant created intolerable working conditions upon her return. *See Taylor v. Virginia Union University,* 193 F.3d 219, 237–38 (4th Cir.1999) (en banc). Her salary and benefits were not reduced, and although her responsibilities were lessened, she was reassigned to quality assurance work in which she previously had done well. Her complaints about such things as having to share a small office are trivial and not legally cognizable.

A separate order effecting the rulings made in this Memorandum are being entered herewith.

## ORDER

For the reasons stated in the accompanying Memorandum, it is, this 29th day of September 2000

ORDERED that

1. Plaintiff's motion to file a supplemental memorandum is granted;

2. Defendant's motion for summary judgment is granted;

3. Judgment is entered in favor of defendant against plaintiff; and

4. The Clerk is directed to close this case.