Regina C. BROWN, Appellant,

v.

Kenneth D. BRODY, Chairman,
Export–Import Bank of the
United States, Appellee.

No. 97–5347.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 15, 1999.

Decided Dec. 21, 1999.

**448**

James L. Kestell argued the cause for appellant. With him on the briefs was Michael P. Deeds.

Michael A. Humphreys, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Wilma A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: WALD,* HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

This is an appeal from an order of the district court, Hogan, J., granting summary judgment for the Export–Import Bank on three counts of unlawful discrimination alleged by a former employee, Regina C. Brown. We affirm the district court's order granting summary judgment for the Bank because Brown has failed to allege any legally cognizable adverse employment action and because her attempts to discredit the Bank's account of its employment decisions as a web of pretextual artifice is thoroughly unconvincing.

I

Brown "is a 50 year old black female with three separate Master's Degrees." Brief for Appellant at 2. She began working at the Export–Import Bank as a GS–12 loan officer in August 1984. During the next ten years, she received two promotions, rising to the level of a GS–14 senior loan officer. In June 1994, she left the Bank to accept an appointment at the State Department as Deputy Assistant Secretary of State for African Affairs.

Brown spent her first year at the Bank on rotational assignment. After working for a short period in several divisions, including three months in Contracts Administration, she switched to the Africa/Middle

---

* Former Circuit Judge Wald was a member of the panel at the time of oral argument, but did not participate in the decision.

East Division, concentrating her efforts on countries located in West Africa. There she remained through the early 1990's, when it became apparent that many of these countries were unable to meet their financial obligations, and that the Bank would curtail its business in the region. By the second quarter of 1993, most of these countries were closed for new business. The Bank expected this condition to endure for some time and Brown concedes that it lasted through at least 1994.

These changes and others prompted the Bank to reorganize its allocation of personnel and shift a number of people into temporary reassignments. Some of the transfers were voluntary, others were not; the rotations fell upon both sexes and upon both black and white employees. It was the Bank's policy to require all senior practitioners to make themselves available for reassignment as required by the Bank's shifting needs. The Bank also considered reassignments of this kind to be an important educational tool for the professional development of its staff.

On September 17, 1993, Brown received word from Raymond Albright—a Senior Vice–President at the Bank, a white male, and Brown's second-level supervisor—that she was to be reassigned to the Contracts Administration Division of the Bank the following month. Brown strongly objected to this reassignment because she believed Contracts was a less prestigious "back-shop" area and because, having worked for a short period in Contracts many years earlier as a GS–12, she felt she had little to learn from such a rotation. The Bank maintained that Brown's presence was needed in Contracts and that the numerous transfers in the fall of 1993 had the effect of balancing the number of senior practitioners between the Bank's various departments.

Unconvinced, Brown thought the "catalyst" behind her transfer was her immediate supervisor, Carl Leik, a white male. By her lights, she was moved because of racial and sexual animus. She first ap-proached one of the Bank's equal employment opportunity counselors with this allegation on September 20, 1993, when she signed a form laying out her rights and responsibilities under the Bank's grievance procedures. Brown made a formal complaint on October 8, naming Leik and Albright as the discriminating officials. Despite her objections, Brown was transferred to Contracts Administration on October 18 along with another GS–14 from the Claims Division, Kenneth Vranich, who is white.

On October 22, 1993, two days after her formal transfer to Contracts Administration, Brown received a copy of her annual performance evaluation from Leik. The evaluation measured her performance in five different categories according to a mathematical scale ranging from five points for an "outstanding" rating to one point for an "unacceptable" rating. Brown received a "superior" rating in the areas of "technical knowledge," "special projects," and "supervision." She received a "fully satisfactory" rating in the "case work" category. This rating was accompanied by remarks which noted the prohibition against further loan activity in West Africa and suggested that Brown lacked enthusiasm for the lesser function of debt collection. Finally, Brown received a two-point "minimally satisfactory" rating for internal and external oral and written communication. The comments attached to that rating stated that "Ms. Brown has consistently been negligent in advising the division's managers of her meetings with the public, developments in her assignments and providing copies of outgoing correspondence. There have been a number of instances of a lack of courtesy." The cumulative average of Brown's scores was 3.4, which, as for any cumulative score between 2.75 and 3.75, meant that Brown received an overall rating of "fully satisfactory." Brown claimed that this was the lowest performance appraisal she had ever received and she met with Leik and Albright to discuss her evaluation one week later on October

29. During that meeting, Albright gave Brown a "Letter of Admonishment" chronicling a number of separately memorialized conflicts between Brown and her supervisors and also between Brown and her peers and superiors in other divisions of the Bank. Brown "indicated that [she] seriously disagreed with the allegations which he was belatedly raising" and signed the evaluation "under protest" because she felt that she should discuss the matter with her attorney. Later that same day, Brown made an informal complaint of discrimination and retaliation against Leik and Albright, but she did not amend her previous formal complaint or file a new one.[1]

During this same period—the fall of 1993—Brown began to receive employment overtures from the State Department. On September 27, Brown was informed that she was being considered for Deputy Assistant Secretary for African Affairs and she was offered that job after an interview on October 8. Although Brown did not accept the position when it was originally offered, she states that she accepted it later that month contingent upon the Bank's agreement to let her return to the Bank after she finished her job at State. She began the process of obtaining a security clearance in December and requested a letter of re-employment from the Bank.

In March 1994, while the State Department had Brown's application for a security clearance under review, the Bank decided to create a new Project Finance section and posted notices for three new positions available for competitive selection. Brown applied for a transfer to one of those positions, but she was not selected during the interviews held on April 29. Albright and Leik were two of three senior managers on the selection board. Brown believed she was not selected in retaliation for having filed an EEO complaint against these individuals the previous fall. However, Brown did not file another complaint. Instead, "[a]s a result of these nonselections and because she remained stuck in the Contracts Division, Brown believed she had no choice but to accept an appointment [as] a Deputy Assistant Secretary of State for African Affairs at the State Department." Brief for Appellant at 6.[2]

On February 14, 1995, Brown commenced this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., charging Kenneth D. Brody, the Chairman of the Export–Import Bank with racial and sexual discrimination as well as retaliation. In her complaint, Brown claimed that the Bank had discriminated against her by involuntarily reassigning her from the Africa/Middle East Division of the Bank to Contracts Administration. She also claimed that the Bank discriminated against her by giving her an evaluation lower than she had been accustomed to receiving, by failing to promote her to a position within the Project Finance Division; and by refusing to provide her with a letter of re-employment after she had accepted a political position with the State Department. After discovery, the Bank moved for summary judgment arguing that Brown's complaint failed to present a genuine issue of material fact and that the Bank was entitled to judgment as a matter of law.

The district court granted the Bank's motion for summary judgment. As to

---

1. There is some dispute about whether the EEO counselor told Brown she must file a formal complaint. The effect of this dispute on the district court's opinion is discussed *infra* at Part II.A.2. It bears mention at this point, however, that Brown's claim to have initiated separate informal complaints on both October 22 and October 29 is in conflict with her own affidavit. *Compare* Brief for Appellant at 5 *with* Brown Aff. ¶ 16, J.A. 368.

2. Brown's affidavit is inconsistent about the time when she received a "firm commitment" from the State Department. She states within the same paragraph that it came in "late May" and on "June 17." Brown also maintains elsewhere in a June 10 memorandum that the State Department would "finalize an offer" "within the next few days."

Brown's claim of improper reassignment, the court ruled that she had failed to establish a prima facie case because the Bank routinely re-assigned employees within its organization as a common business practice; and because other similarly situated employees within the defendant's organization were, in fact, involuntarily reassigned on a regular basis. *See Brown v. Brody,* Civ. No. 95–298 (TFH), mem. op. at 6–7 (D.D.C. Nov. 12, 1997). Brown's claims of discrimination pertaining to a lower-than-usual performance appraisal and a letter of admonishment were, in the court's view, lacking in substance. *See id.* at 8, 10–11. The court also found that the Bank's actions in not transferring Brown to one of the three available positions within its Project Finance Division was not unlawful because the Bank presented legitimate, non-discriminatory reasons for selecting others over Brown. *See id.* at 12–14.

Brown has abandoned two of the theories she advanced in the proceedings below. She does not now claim that she was constructively discharged from her job because of the Bank's alleged discriminatory practices. *See id.* at 10–12. Nor does she challenge the district court's ruling that she was not entitled to a letter of re-employment when she left the Bank to accept a higher-paying political appointment at the State Department for an indefinite duration. *See id.* at 14–17.

## II

Brown sees discrimination, racial and sexual, in three of the Bank's actions: (1) transferring her to Contracts Administration (Claim I); (2) giving her a "fully satisfactory" evaluation and a letter of admonishment (Claim II); and (3) denying her a transfer to a newly created position in Project Finance (Claim III). She also alleges that in taking the last two actions, the Bank unlawfully retaliated against her.[3]

### A. Sexual Discrimination

 Viewing the record in the light most favorable to Brown, we detect no genuine issue about any material fact relating to Brown's claims of sexual discrimination and we are convinced that no reasonable jury could return a verdict in her favor on this basis. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1288 (D.C.Cir.1998) (en banc). With respect to her first claim—involuntary transfer—Brown argues that she was "exchanged" with a lower-graded white female from Contracts Administration.[4] This decision thus was not based on sex. With respect to the second claim—the performance evaluation—there is no evidence that women were singled out for poor performance reviews. Brown's lone example of her supervisor Leik's past habit of issuing poor performance ratings was a black man, Kenneth M. Tinsley, and his deposition was hardly supportive of Brown's allegation of pattern discrimination. *See* Tinsley Dep., J.A. 360–64, 455–56. On her third claim—non-selection for a desired lateral transfer—the district court correctly observed that any sexual discrimination claim would be baseless because two of the three employees selected for that transfer were women. *See Brown,* mem. op. at 12 n.5.

### B. Racial Discrimination and Retaliation

In *Mungin v. Katten, Muchin & Zavis,* 116 F.3d 1549, 1556–57 (D.C.Cir.1997), we

---

**3.** The record contains nothing to substantiate the claim of systemic disparate treatment weakly alleged in Brown's complaint; in any event, her brief does not list such a claim as an issue on appeal. The record is also devoid of anything to support a disparate impact theory.

**4.** Brown's description of this move as an "exchange" is not accurate. *See infra* Part II. B.1.

wrote: "Perhaps in recognition of the judicial micromanagement of business practices that would result if [courts] ruled otherwise, other circuits have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes." This was said on review of a verdict. Here, the appeal is of a summary judgment and the employer is federal, rather than private. Whether that should matter in our analysis, whether an "adverse" employment action is a prerequisite for such a Title VII suit, is the question we now consider.

### 1. *The Need for an Adverse Personnel Action*

Federal employment practices and private employment practices are regulated in separate provisions of Title VII. The provisions differ slightly. Private employers must comply with 42 U.S.C. § 2000e–2(a), which makes it an unlawful employment practice to discriminate on the basis of "race, color, religion, sex, or national origin" in hiring decisions, in compensation, terms and conditions of employment, and in classifying employees in a way that would "adversely affect" their status as employees. Federal employers, including government corporations such as the Export–Import Bank, must adhere to 42 U.S.C. § 2000e–16: "All personnel actions affecting employees . . . in executive agencies as defined in section 105 of Title 5 . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a).

"Despite the difference in language between [the Title VII provisions governing private and federal employers], we have held that Title VII places the same restrictions on federal and District of Columbia agencies as it does on private employers,

*Barnes v. Costle,* [561 F.2d 983, 988 (D.C.Cir.1977)], and so we may construe the latter provision in terms of the former." *Bundy v. Jackson,* 641 F.2d 934, 942 (D.C.Cir.1981). Our court has therefore applied the familiar test of *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in Title VII suits against federal employers, even though the Supreme Court formulated the test in a private sector discrimination case. *See, e.g., Holbrook v. Reno,* 196 F.3d 255, 259 (D.C.Cir.1999); *Parker v. Secretary, U.S. Dep't of Housing & Urban Dev.,* 891 F.2d 316, 320 (D.C.Cir.1989); *Mitchell v. Baldrige,* 759 F.2d 80, 84 (D.C.Cir.1985); *McKenna v. Weinberger,* 729 F.2d 783, 788 (D.C.Cir.1984); *Valentino v. United States Postal Serv.,* 674 F.2d 56, 63 (D.C.Cir. 1982). The Supreme Court too has assumed the test's applicability to the federal government. *See United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

In federal as in private employment cases, our decisions—with an exception to be mentioned in a moment—require plaintiffs to satisfy the first step of the *McDonnell Douglas* test by showing that they have been subjected to some sort of adverse personnel or employment action. Thus, to state a prima facie claim of disparate treatment discrimination, the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *See, e.g., McKenna,* 729 F.2d at 789.[5] For retaliation claims, such as the one Brown alleges, the prima facie requirements are slightly different. The plaintiff must show "1) that she engaged in a statutorily protected activity; 2) that the employer took an adverse personnel action; and 3) that a causal connection existed between the two." *Mitchell,* 759 F.2d

---

5. Other circuits use the same formula. *See, e.g., Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 95 (2d Cir.1999); *Brennan v. Metropolitan Opera Ass'n,* 192 F.3d 310, 316 (2d Cir.1999); *Price v. S–B Power Tool,* 75 F.3d 362, 365 (8th Cir.1996); *Little v. Cox's Supermarkets,* 71 F.3d 637, 642 n. 3 (7th Cir.1995).

at 86 (quoting *McKenna*, 729 F.2d at.790); *accord, e.g., Carney v. American Univ.*, 151 F.3d 1090, 1095 (D.C.Cir.1998); *Paquin v. Federal Nat'l Mortgage Ass'n*, 119 F.3d 23, 31 (D.C.Cir.1997); *Passer v. American Chem. Soc'y*, 935 F.2d 322, 331 (D.C.Cir.1991). A common element required for discrimination and retaliation claims against federal employers, and private employers, is thus some form of legally cognizable adverse action by the employer. *See Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1448 n. 10 (11th Cir. 1998) (citations omitted).

Realizing the difficulty these formulations pose for her case, as will become clear later, Brown tells us the requirement of an adverse personnel action applies only to private sector Title VII cases, but that in Title VII suits against federal employers, any sort of personnel action undertaken for discriminatory reasons suffices. Strong support for her position seems to come from the following passages in *Palmer v. Shultz*, 815 F.2d 84, 97–98 (D.C.Cir. 1987):

> A plaintiff may bring a Title VII claim for alleged discrimination with respect to any employment decision by an agency of the federal government. The statute itself states that "all personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based on [race, color, religion, sex, or national origin]." 42 U.S.C. § 2000e–16[ (a) ].
>
> \* \* \*
>
> [This language covers] "all personnel actions" [based on race, color, religion, sex, or national origin] regardless of whether the personnel action affects promotions or causes other tangible or economic loss.

If we took these statements from *Palmer* at face value, the opinion would appear to conflict with other federal employment decisions in this circuit. This court's opinion in *Mitchell*, for example, stated the test for retaliation in terms, not of any personnel action, but of an "adverse personnel action" and it did so in a Title VII suit against a federal agency (the Commerce Department). *See* 759 F.2d at 86. In *McKenna v. Weinberger*, 729 F.2d at 789, another Title VII suit against a federal agency, this court held that for a disparate treatment claim to succeed there must be "proof that an adverse personnel action was taken and that it was motivated by discriminatory animus. The inquiry in such a case must focus on the circumstances surrounding the adverse personnel action." Furthermore, *Palmer*'s stress on the language of § 2000e–16(a) as contrasted with the provision applicable to private employers, *see* 815 F.2d at 97–98, seems at odds with *Barnes*, 561 F.2d at 988, and with *Bundy*, 641 F.2d at 942. The cases just mentioned—*Bundy, Barnes, Mitchell* and *McKenna*—were decided before *Palmer*, but *Palmer* cited none of them.

■ Since one panel of this court cannot overrule another, *LaShawn A. v. Barry*, 87 F.3d 1389, 1393, 1395–96 (D.C.Cir.1996) (en banc), we must attempt to reconcile *Palmer* with our other decisions. This requires us to examine the case in further detail. *Palmer* reversed a district court's dismissal of a class action brought against the State Department by female employees alleging a host of discriminatory practices. The State Department argued that while there might be statistical evidence showing that it had discriminated against women in certain types of personnel decisions, the plaintiffs could not state a claim regarding other types of employment decisions in the absence of similar evidence. The court rejected that argument, concluding that "when plaintiffs in a Title VII case introduce statistical evidence of an extreme disparity in the selection rates for men and women for a certain type of job, the fact that these plaintiffs have insufficient evidence to establish an inference of discrimination regarding other employment decisions should not block an inference of discrimination on the specific type

of employment decision at issue." 815 F.2d at 98.[6]

Unlike *Palmer*, but like *Mitchell* and *McKenna*, Brown's claim is an individual disparate treatment claim rather than a pattern or practice claim. The very different nature of the claim in *Palmer* places in context the portion of the opinion we have quoted above. When *Palmer* stressed § 2000e–16's prohibition against discrimination in "all personnel actions," and concluded that the plaintiffs could state a claim "regardless of whether the personnel action affects promotions or causes other tangible or economic loss," *id.*, it relied on *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), decided just months before. In *Meritor*, the Supreme Court recognized a cause of action for "hostile work environment" sexual harassment in addition to the more traditional cause of action for so-called quid pro quo harassment. *See id.* at 64, 106 S.Ct. 2399. After *Meritor*, plaintiffs could maintain an action even in the absence of a tangible economic effect on employment if the work atmosphere was "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." *Id.* at 66, 106 S.Ct. 2399 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971)); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (explaining the difference between specific claims and hostile work environment claims and noting that the latter requires a showing of "severe or pervasive conduct") (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)); *see also id.* at 768, 118 S.Ct. 2257 (Thomas, J., dissenting) ("In race discrimination cases, employer liability has turned on whether the plaintiff has alleged an adverse employment consequence, such as firing or demotion, *or* a hostile work environment.") (emphasis added).[7]

Brown also relies upon another decision of this court, *Passer v. American Chemical Society*, 935 F.2d 322 (D.C.Cir.1991), to show that an employer's actions need not have any effect on the employee's working conditions. *Passer* held that a retiring employee could state a claim for retaliation under the Age Discrimination in Employment Act when his former employer indefinitely postponed a public symposium in his

---

6. That conclusion was illustrated by the following example: "if Title VII plaintiffs present evidence that the underselection of women for a particular type of job assignment measures above 3.0 standard deviations, this evidence necessarily raises an inference of discrimination in these assignments regardless of the statistical evidence concerning other assignments." 815 F.2d at 98–99. *Palmer*'s conclusion, and the example following it, explain an earlier passage in which the court said that the plaintiffs "may bring a disparate treatment claim regarding discrimination in any type of personnel decision regardless of whether or not that discrimination has an effect on other, arguably more important, personnel decisions." *Id.* at 98. By this point, the court had already found evidence of pervasive sexual discrimination at the Department based on statistical evidence alone. *See id.* at 91–97.

7. Brown also cites *Hayes v. Shalala*, 902 F.Supp. 259 (D.D.C.1995), to support her argument that *Palmer* does not require a tangible effect in order for a federal employee to state a claim under § 2000e–16(a). The district court in *Hayes* noted that *Palmer* could be read as in conflict with the narrower reading of § 2000e–16 in *Page v. Bolger*, 645 F.2d 227 (4th Cir.1981). While recognizing that it was bound by *Palmer*, the court confined its decision in *Hayes*. After stating "that many of Mr. Hayes' allegations, if believed, might have affected the terms of his employment and thus have been actionable even under the analysis in *Page*" because they would have "directly affected Mr. Hayes' work record or the terms of his compensation," 902 F.Supp. at 266, the court decided that "Mr. Hayes must be permitted to argue that the totality of actions taken by his employer collectively created a harassing and retaliatory environment, even if individual actions may not have left a permanent paper trail or may even have been 'mediate' employment decisions as identified by the Fourth Circuit in *Page*." *Id.* at 267.

honor after the employee filed an ADEA claim against it. *See id.* at 331–32. The employer freely admitted that it did so in retaliation, *see id.* at 330, but argued that the retaliation provision only applied to decisions affecting employment and that Passer could not state a claim because he had left its employment. The court rejected that argument because a great number of retaliatory actions taken by employers occur after employees have left. *See id.* at 331 (citing cases).

In this case, as in *Passer*, we are less concerned with the *kind* of employment action involved, than with its *effect* on the employee. Viewed in this light, there is nothing remarkable about the statement in *Palmer* that no particular type of personnel action was automatically excluded from serving as the basis of a cause of action under 42 U.S.C. § 2000e–16(a).[8] This amendment also changed 5 U.S.C. § 2302(a)(2)(A)(xi). That subsection had read "any other significant change in duties or responsibilities which is inconsistent with the employee's salary or grade level." It now reads "any other significant change in duties, responsibilities, or working conditions." *See* § 5(a)(2), 108 Stat. 4363. Even so, there must still be some kind of injury for a federal employee to state a claim. Under 42 U.S.C. § 2000e–16(c), a federal employee must first be "aggrieved" in order to bring an action and § 2000e–16(d) states that civil actions brought by federal employees are governed by the same rules as those controlling suits by private employees set forth in § 2000e–5(f)-(k). Section 2000e–5(f)(1) refers to the "person or persons aggrieved" numerous times throughout its substantial length.

In short, in Title VII cases such as Brown's, federal employees like their private counterparts must show that they have suffered an adverse personnel action in order to establish a prima facie case under the *McDonnell Douglas* framework. How this affects Brown's claims is the next subject.[9]

### 2. Lateral Transfers

Brown alleges that the Bank discriminated against her in two lateral transfer decisions. It first assigned her to a position she did not desire and later declined to assign her to a newly created position she did desire. There is no dispute that the pay and benefits were the same in Brown's original job, in the job to which she was sent, and in the job she was denied. Brown has argued that the same legal standards should govern both her involuntary transfer to Contracts Administration and the denial of her bid for a desired transfer into Project Finance. *See* Appellant's Reply Brief at 11. We agree. Unfortunately for Brown, this means that claims one and three both fail as a matter of law.

"The clear trend of authority," as we mentioned in *Mungin*, 116 F.3d at 1556–

---

**8.** *Palmer* drew support for its conclusion from the listing of specific personnel actions covered by the Foreign Service Act. *See* 815 F.2d at 97. There is no comparable specific statute for the Export–Import Bank. Title VII does not itself define what constitutes "personnel actions" by federal employers. However, Title V, which prohibits discrimination and retaliation by federal entities, mentions employment actions such as "a detail, transfer or reassignment," "a performance evaluation," and "any other significant change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A)(iv), (viii), (xi); *see also id.* § 2302(b)(1)(A). Although this provision did not become applicable to organizations like the Export–Import Bank

until after the events giving rise to this case, *see* Act of Oct. 29, 1994, Pub.L. No. 103–424, § 5(a)(3), 108 Stat. 4361, 4364 (amending § 2302 to include "a Government corporation as defined in section 9101 of title 31"), we agree with Brown that involuntary transfers, performance evaluations, and refusals of transfer applications are "personnel actions" covered by § 2000e–16(a).

**9.** Part II.B.1 of this opinion has been circulated to and approved by the entire court and thus constitutes the law of the circuit. *See Irons v. Diamond*, 670 F.2d 265, 268 n. 11 (D.C.Cir.1981).

57, "is to hold that a 'purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action.'" *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997) (quoting *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)). A survey of the relevant case law shows that the authority requiring a clear showing of adversity in employee transfer decisions is both wide and deep. *See, e.g., Doe*, 145 F.3d at 1453–54; *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 886–87 (6th Cir.1996); *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 135–36 (7th Cir.1993); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382–83 (8th Cir.1994); *Flaherty v. Gas Research Institute*, 31 F.3d 451, 457–58 (7th Cir.1994); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 885–86 (7th Cir. 1989); *Caussade v. Brown*, 924 F.Supp. 693, 701, 704 (D.Md.1996), *aff'd without opinion*, 107 F.3d 865 (4th Cir.1997); *Kauffman v. Kent State Univ.*, 815 F.Supp. 1077, 1083–86 (N.D.Ohio 1993); *McCoy v. WGN Television*, 758 F.Supp. 1231, 1236–37 (N.D.Ill.1990); *Haimovitz v. United States Dep't of Justice*, 720 F.Supp. 516, 523–27 (W.D.Pa.1989); *Ferguson v. E.I. duPont de Nemours & Co.*, 560 F.Supp. 1172, 1201 (D.Del.1983); *cf. Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.

1995); *Connell v. Bank of Boston*, 924 F.2d 1169, 1178–80 (1st Cir.1991).[10] *See generally* Ernest F. Lidge III, *The Meaning of Discrimination: Why Courts Have Erred in Requiring Employment Discrimination Plaintiffs to Prove that the Employer's Action was Materially Adverse or Ultimate*, 47 U. Kan. L.Rev. 333, 336–38 & n.22, 341 (1999).

The Supreme Court reinforced this approach to discrimination claims in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), which cited many of the cases listed above when it announced a "tangible employment action" standard in cases of vicarious liability. The relevant passage of the Court's opinion deserves full quotation:

> The concept of a tangible employment action appears in numerous cases in the Courts of Appeals discussing claims involving race, age, and national origin discrimination, as well as sex discrimination. Without endorsing the specific results of those decisions, we think it prudent to import the concept of a tangible employment action for resolution of the vicarious liability issue we consider here. A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

10. Courts of appeals routinely apply the same standards to evaluate Title VII claims as they do ADA claims, ADEA claims, and even ERISA claims. *See, e.g., Doe*, 145 F.3d at 1448 ("We can assist our consideration of the adversity standard under the ADA, therefore, by looking to the broader experience of our court and others with employment discrimination law."); *see also id.* at 1447–48 (comparing *Harris v. H & W Contracting Co.*, 102 F.3d 516, 523–24 (11th Cir.1996) (ADA); *Maddow v. Procter & Gamble Co.*, 107 F.3d 846, 852–53 (11th Cir.1997) (ADEA), *Collins v. State of Illinois*, 830 F.2d 692, 702–04 (7th Cir.1987) (Title VII)); *Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319 (5th Cir.1999) (adopting the same adversity requirement for Family Medical Leave Act); *Little*, 71 F.3d at 642–43 (same as to ERISA claims); *Pendarvis v. Xerox Corp.*, 3 F.Supp.2d 53, 57 (D.D.C.

1998) (same as to Pregnancy Discrimination Act). The Supreme Court does so as well. *See, e.g., Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257. This is so because these statutes often use the same "terms and conditions" language to proscribe discriminatory employment practices. *Compare, e.g.*, 29 U.S.C. § 623(a)(1) (ADEA), *and* 42 U.S.C. § 2000e–2(a) (Title VII), *with* 42 U.S.C. § 12112(a) (ADA). For the same reason, courts rely on cases applying like-worded retaliation provisions in different statutes. *See Passer*, 935 F.2d at 330 (noting that the ADEA retaliation provision, 29 U.S.C. § 623(d), "is parallel to the anti-retaliation provision contained in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a), and cases interpreting the latter provision are frequently relied upon in interpreting the former").

Compare *Crady* v. *Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"), with *Flaherty* v. *Gas Research Institute*, 31 F.3d 451, 456 (7th Cir.1994) (a "bruised ego" is not enough); *Kocsis* v. *Multi-Care Management, Inc.*, 97 F.3d 876, 887 (6th Cir.1996) (demotion without change in pay, benefits, duties, or prestige insufficient) and *Harlston* v. *McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994) (reassignment to more inconvenient job insufficient).

*Id.* at 761, 118 S.Ct. 2257; *see also id.* at 768, 118 S.Ct. 2257 (Thomas, J., dissenting) ("In race discrimination cases, employer liability has turned on whether the plaintiff has alleged an adverse employment consequence, such as firing or demotion, or a hostile work environment. If a supervisor takes an adverse employment action because of race, causing the employee a tangible job detriment, the employer is vicariously liable for resulting damages.").

These developments allow us to announce the following rule: a plaintiff who is made to undertake or who is denied a lateral transfer—that is, one in which she suffers no diminution in pay or benefits— does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm. Mere idiosyncrasies of personal preference are not sufficient to state an injury. *See, e.g., DiIenno* v. *Goodwill Indus.*, 162 F.3d 235, 236 (3d Cir.1998); *Doe*, 145 F.3d at 1448 (finding "no case, in [the 11th] or any other circuit,

in which a court explicitly relied on the subjective preferences of a plaintiff to hold that plaintiff had suffered an adverse employment action"); *Smart* v. *Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996) (emphasizing that "not everything that makes an employee unhappy is an actionable adverse action").

In both *Ellerth* and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Court specifically identified "discharge, demotion, or undesirable reassignment" as three examples of the kind of "tangible employment action" for which an employee may bring a vicarious liability suit against her employer under Title VII. 524 U.S. at 765, 118 S.Ct. 2257; 524 U.S. at 808, 118 S.Ct. 2275. Brown was not discharged; she left the Bank for a more prestigious position and a sixty percent raise. Nor was Brown demoted; she retained the same rank and salary at all times relevant to this litigation. While Brown was temporarily reassigned to a position she thought undesirable, and she was later not selected for a position she did find desirable, there is no objective basis for finding that she was harmed by these decisions in any tangible way. Therefore, the district court properly disposed of claims one and three for failure to state a prima facie case.

3. *"Fully Satisfactory" Evaluation and Letter of Admonishment*

Brown argues that the district court committed two reversible errors in its consideration of her performance evaluation and letter of admonishment. First, Brown correctly observes that the district court identified a material factual dispute about the circumstances surrounding Brown's failure to file a formal EEO complaint. Brown now argues this question should have been submitted to a jury. One wonders why. The district court *assumed* that a "reasonable jury" might allow Brown to prevail against the Bank's exhaustion defense, but ultimately concluded that Brown did not make out a prima facie claim. *See*

*Brown,* mem. op. at 9–11. Second, Brown argues that the district court erred in failing to consider her "satisfactory" performance rating as an independent injury and improperly "subsumed" that inquiry into Brown's now-abandoned constructive discharge claim. *See* Brief for Appellant at 8, 17–18. The analysis appears to be correct for the most part, but the district court did tersely observe that "the appraisal and letter of admonishment ... did not threaten or even affect [Brown's] employment at Ex–Im." *Brown,* mem. op. at 11. While the court offered no explanation for this conclusion, this is hardly fatal since our review of the grant of summary judgment is de novo.

■ On the question whether Brown's "fully satisfactory" performance rating is an adverse employment action, the weight of contemporary authority is once again solidly with the Bank. Just as lateral transfers do not ordinarily constitute "adverse actions," a similarly thick body of precedent, cited in the margin, refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions.[11] These cases support the Bank's contention that "[n]either the letter nor the appraisal constituted adverse action because neither affected the appellant's grade or salary." Brief for Appellee at 7.

While Brown's evaluation may have been lower than normal, it was not adverse in an absolute sense. The overall "fully satisfactory" rating is the middle of five grades and Brown was rated "superior" in three of five specific areas. It also appears that such evaluations could be adjusted on appeal before a separate administrative branch and that Leik's tough evaluations had been successfully adjusted by at least one other employee. Although Brown clearly knew of this procedure,

there is no evidence that she ever sought such an adjustment.

#### 4. *Allegations of Pretext*

In addition to Brown's failure to establish a prima facie case of discrimination or retaliation, there is an alternative ground for affirming the grant of summary judgment in favor of the Bank—namely, Brown failed to show that the Bank's explanations for its actions were a pretext for discrimination and retaliation.

■ The analysis of pretext allegations proceeds as follows:

Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

*Aka,* 156 F.3d at 1289. Although the presentation of evidence rebutting pretext is sometimes sufficient to defeat a defendant's motion for summary judgment, *see Carpenter v. Federal Nat'l Mortgage Ass'n,* 165 F.3d 69, 72 (D.C.Cir.1999), Brown, who had the ultimate burden of persuasion, offered nothing beyond her own speculations and allegations to refute the Bank's legitimate, non-discriminatory reasons for its decisions. "As courts are

---

11. *See Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 708, 710 (5th Cir.1997); *Rabinovitz v. Pena,* 89 F.3d 482, 486, 488–90 (7th Cir. 1996); *Smart,* 89 F.3d at 442–43; *Kelecic v. Board of Regents,* No. 94 C 50381, 1997 WL 311540, at *9 (N.D.Ill. June 6, 1997); *Lucas v.* *Cheney,* 821 F.Supp. 374, 375–76 (D.Md. 1992); *Nelson v. University of Me. Sys.,* 923 F.Supp. 275, 280–82 (D.Me.1996); *cf. Raley v. St. Mary's County Comm'rs,* 752 F.Supp. 1272, 1278 (D.Md.1990).

not free to second-guess an employer's business judgment," a plaintiff's mere speculations are "insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988).

a. *Involuntary Lateral Transfer*

 Brown alleges that her involuntary transfer to Contracts was not consistent with the treatment of other employees and that the real purpose of the transfer was to provide employment development for a white female, Mrs. El Mohandes, at Brown's expense. Brown's theory, and theory is all that there is, does not stand up in the face of the Bank's explanation.

Brown was transferred because there was almost no work for her to do in her original position: the West African countries she oversaw were barred from taking out more loans and her duties were confined to loan collection. That condition was forecasted to continue and did in fact continue for at least a year. All personnel at Brown's level were required to sign a statement acknowledging that the possibility of transfer to other divisions went with the job and, unlike performance ratings, such transfers were not appealable. Brown's transfer was at all times considered to be temporary, a one year rotation. A white male, Mr. Vranich, was transferred into Contracts Administration at the same time as Brown. The result was to balance employees at Brown's level across each of the Bank's various divisions. Contrary to Brown's persistent suggestion, El Mohandes, who was brought over from Contracts to Brown's division, did *not* take Brown's job. El Mohandes took a lower-level job in the North African portion of the division and the countries El Mohandes dealt with—Morocco, Algeria, Tunisia—were not barred from receiving new loans. That El Mohandes was later promoted to Brown's level during the next two years as the Middle East–Africa Division merged with the European Division is irrelevant. Promotion is not necessarily a zero-sum game. It does not follow that Brown was harmed because another employee with substantially different area of expertise in an international bank was advanced. Contrary to Brown's selective quotation from Albright's memorandum for the record, *see* Brief for Appellant at 7 n.4, Albright moved Brown for Brown's benefit—both to reduce tension with her immediate supervisor and to employ Brown productively after West Africa was closed for further business. Brown went on to receive commendations from her new boss, Mrs. Newton. Brown's unsubstantiated anecdotal evidence that Contracts was a "back-shop" dead-end is defeated by two facts: Brown was commended for her work there, and, at the very least, El Mohandes successfully transferred out of Contracts to other divisions in the Bank. Brown's argument that a white female, Mrs. Emmet, had never been rotated to Contracts is inconclusive. Emmet was assigned to countries that were still able to do business with the Bank.

b. *Job Appraisal and Admonishment Letter*

 With respect to discrimination, Brown offers only one example to prove that Leik demonstrated a pattern of writing poor evaluations for black employees. That individual did not support Brown's allegations in his deposition, but instead consistently described his relationship with Leik as "good" despite receiving a lower-than-normal performance appraisal.

 Brown's retaliation claim is no more substantial. Brown was first informed of Albright's intention to transfer her on September 17, 1993. Brown filed her first informal complaint on October 8, 1993. Brown first received her evaluation on October 22. She then filed an informal complaint alleging retaliation on October 26. Brown discussed the evaluation with Leik and Albright for the first time on October 29, when she signed it "under

protest." It appears she received the letter of admonishment on October 29, a letter that was prepared on October 26.

The problem with Brown's retaliation claim is that the signature dates listed on the evaluation are September 3 for Leik and September 8 for Albright. In other words, the evaluation was completed by Leik two weeks before Brown was first informed of her upcoming transfer and more than a month before Brown filed her first informal complaint. Hence, the evaluation could not have been retaliatory. Brown offered no evidence that her evaluation was backdated or that a delay between the preparation and delivery of performance reviews was abnormal.

Brown's insistence in claim two that there was no reason for her to anticipate either a poor evaluation or a letter of admonishment is greatly undermined by her arguments advanced in support of claim one that significant tension existed between her and Leik in the months leading up to her involuntary transfer. Brown cannot have it both ways. Either the relationship was bitter, which very slightly supports claim one, or the relationship seemed smooth, which very slightly supports claim two. Furthermore, Albright's letter of admonishment thoroughly documents numerous conflicts between Brown and Leik, and her conflicts with employees in other divisions of the bank.

c. *Non-Selection for Desired Lateral Transfer*

■ Despite Brown's consistent representations to the contrary, the Bank did *not* deny Brown a promotion. The Bank did not select her for a lateral transfer into one of three newly created GS–14 positions Brown thought to be more appealing. A higher GS–15 position was also advertised, but the Bank canceled that position and no one was hired to fill it. *See Brown,* mem. op. at 12 n.4.

The Bank's explanation of its decision to transfer three other employees is sufficient to defeat Brown's claims of pretext. First, it is undisputed that two of the three people transferred into the new positions were senior to Brown. Thus, the alleged discrimination or retaliation cannot be considered a pattern. The differences between Brown and the third selectee are too nebulous to support an inference of either discrimination or retaliation. "[T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 259, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see Aka,* 156 F.3d at 1294; *Fischbach v. District of Columbia,* 86 F.3d 1180, 1182 (D.C.Cir.1996).

■ Brown presses her retaliation claim by observing that Leik and Albright were two of the three people on the panel which made the transfer decision. Their participation on the panel is hardly surprising. Who else would have served on such a panel? The position was squarely within their area of expertise—lending. Their involvement might matter if Brown had successfully demonstrated discrimination or retaliation at an earlier stage in their relationship or a pattern of discrimination against other similarly situated black people, but she has not. *See Aka,* 156 F.3d at 1289; *Fischbach,* 86 F.3d at 1182.

\* \* \*

For the reasons set forth above, the district court's order granting summary judgment for the Export–Import Bank is

*Affirmed.*