Marshall **FREEDMAN**, Appellant,

v.

**MCI TELECOMMUNICATIONS CORPORATION**, Appellee.

No. 00–7238.

United States Court of Appeals, District of Columbia Circuit.

Argued May 4, 2001.

Decided July 6, 2001.

motion for attorney's fees for prosecuting this appeal is denied.

Bruce J. Terris argued the cause and filed the briefs for appellant.

Harvey D. Rumeld argued the cause for appellee. With him on the brief was Thomas F. O'Neil, III.

Before: EDWARDS, Chief Judge, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Title VII of the Civil Rights Act of 1964 forbids an employer from "discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Marshall Freedman contends that MCI Telecommunications violated that prohibition by discriminating against him because of his religion during his brief but tumultuous employment there in 1997.

## I.

The story begins in Spring 1997 when Freedman, an Orthodox Jewish man, interviewed for a position as a Network Services Engineer (NSE). Freedman arrived at the interview wearing his religious garments: a yarmulka (also known as a kippah or skullcap) and fringes. He was first interviewed by Jeff Porter, who discussed Freedman's qualifications and showed him the facility. At the end of this interview, Freedman explained to Porter that, because of his religion, he must be permitted time off for various Jewish holidays and that his schedule needed to accommodate the Sabbath, which required him to be home before sundown on Fridays. Freedman claims that Porter "stormed out" of the interview when he learned of his religious restrictions.

Nonetheless, the second phase of the interview proceeded, and Freedman met with Leo Smith, who would actually make the hiring decision. During his interview with Smith, Freedman reiterated his scheduling needs. Shortly after this interview, Smith contacted Freedman, extending a job offer in a phone call to Freedman's wife, and confirming the offer by written letter on May 1. Freedman began work on May 12.

By May 29, the company had its first inkling that something was wrong. On that date, Smith, the manager of the MCI facility where Freedman was employed, received a five-page, handwritten letter from Freedman detailing a number of complaints about his working conditions as well as listing several requests relating to his training and days that he needed off for jury duty and Jewish holidays. Smith told Porter, Freedman's immediate supervisor, to discuss the issues with Freedman and work out solutions.

Among Freedman's early round of complaints was a lack of access to computers and tools. Freedman was unhappy that he had not yet been assigned his own computer workstation. He was also concerned that he was required to share tools with co-workers. During this early phase of his employment, Freedman was being trained to perform his new job by working with David Swithers and Peter Cartland.

In the first two weeks of June, Freedman reminded Porter that he needed time off for the upcoming Shavous holiday. Freedman claims that, during his discussions with Porter regarding holiday leave, Porter expressed reluctance, even anger, at allowing the time off. Shortly after these meetings, Porter informed Freedman that he was to be moved to the night shift.

On June 9, 1997, Freedman began his tenure on the night shift and had the opportunity to work with a mentor, Scott Huff. Freedman claims, though, that his experiences with Huff were cut short because Huff was very busy covering for other technicians who were on vacation.

On August 12, 1997, Freedman suffered a severe headache and fainting spell that required him to go to the hospital. For the next several weeks, he was absent from work on disability leave. Freedman returned to work on October 6. He claims that he did not have access to a computer workstation for the first three weeks of his return to the day shift. On October 28, 1997, Freedman met with Edward Lynch, a senior human resource generalist. Apparently in response to this meeting, Freedman forwarded to Lynch an 18–page, handwritten letter detailing his claim of discrimination. On November 21, 1997, Freedman filed a charge of discrimination with the Equal Employment Opportunity Commission.

Meanwhile, MCI was undergoing significant structural changes. Sometime in late October or early November, William MacDonald, the Senior Manager of Operations for Washington, D.C. and Virginia, asked Smith for a list of employees in order of their usefulness. Smith provided MacDonald with a ranking that placed Freedman at or near the bottom of all the employees in his department. MacDonald used this list as a basis for making recommendations to his supervisor that employees, including Freedman, be cut from several departments. On January 16, 1998, Freedman was informed that he was to be terminated on March 28, 1998. Freedman filed another charge of discrimination with the EEOC on January 29, 1998. The EEOC declined to pursue the charges on August 11, 1998, and Freedman brought suit in the district court on November 11, contending that MCI had violated Title VII of the Civil Rights Act.

On a motion by MCI, the district court granted summary judgment against Freedman on August 22, 2000. Though sometimes for different reasons, we agree with the district court that MCI is entitled to judgment as a matter of law.

## II.

Rule 56 indicates that summary judgment is appropriate when there is "no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The substantive law is used to identify the "material" facts. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And there must be a "genuine" dispute about those material facts; that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *See id.*

For this case, Title VII provides the legal framework. Freedman is responsible for making out a prima facie case that (1) he is in a protected class, (2) that MCI took an adverse employment action against him and (3) that MCI took the adverse employment action because of his membership in a protected class. *See Brown v. Brody,* 199 F.3d 446, 452 (D.C.Cir.1999). It is undoubted that Freedman is a member of a protected class. The contest is in whether he can demonstrate adverse employment actions taken because of his protected status.

Freedman sees discrimination in the following occurrences. First, he claims that his assignment to the night shift was an act of discrimination. Second, he perceives discrimination against him in training opportunities. In a third, and related, complaint, he claims that he was subject to disparate treatment regarding MCI's mentorship program. Fourth, he claims that he was denied the use of computers and tools during his tenure. Fifth, he claims that he was given inappropriate assignments. Sixth, he thinks he was denied one-on-one feedback from supervisors given to other employees. Seventh, he claims that he was badly treated by Jeff Porter. Eighth, and finally, he contends that he was discharged because the joint operation

of the other actions he describes made him underqualified and ripe for discharge. We conclude that summary judgment was appropriate because each of the activities complained of, taken alone or collectively, fails to rise to the level of an adverse employment action, lacks evidence of disparate treatment, or both.

### A.

Consider first the problem of Freedman's assignment to the night shift. Freedman contends that he was transferred to the night shift because of his religion. Specifically, he contends that Porter moved him to the night shift in retaliation for his request for time off for Jewish holidays. The disparate treatment, according to Freedman, was that NSEs were not transferred to the night shift unless they agreed to go. Since Freedman objected to being moved, he contends that he was treated both adversely and differently than his co-workers.

█ The district court, relying on our decision in *Brown*, concluded that Freedman had not suffered an adverse employment action because the transfer to the night shift was lateral and there was no corresponding decrease in salary or benefits. *See Freedman v. MCI*, No. 98–2753, slip op. at 15 (D.D.C. Aug. 24, 2000). We think that this may read our decision in *Brown* too broadly. In *Brown*, we held that a purely lateral transfer was not, in itself, an adverse employment action *unless* "there are some other materially adverse consequences affecting the terms, conditions, or privileges of [the plaintiff's] employment ..." *Brown*, 199 F.3d at 457. Thus, it is not enough to ask whether the transfer was purely lateral. We must also ask if other changes in terms, conditions, or privileges followed from the transfer. It is hard to say that transfer to the night shift would not constitute such a change, at least in conditions or privileges. Freed-

man testified that the change in hours interfered with his education. Further, the fact that Freedman received a pay differential for working on the night shift does not, as the district court held, necessarily demonstrate that he was not adversely affected by the change. Rather, it could demonstrate that the night shift was an undesirable assignment.

█ Freedman fails to make out a claim of discrimination because he has not established that he was treated differently than other employees because of his religion. MCI contends that Freedman's transfer to the night shift can be explained by Porter's conclusion that Freedman would receive better training on the night shift. In a case such as this, where the plaintiff claims discrimination and the defendant offers evidence of a legitimate reason for an adverse action, the burden shifts to the plaintiff to produce evidence rebutting the employer's legitimate reason. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Cones v. Shalala*, 199 F.3d 512, 516 (D.C.Cir.2000). Freedman offered no evidence that the proffered reason was a pretext. Specifically, in his statement to the district court of disputed facts, Freedman suggested that the pace of the night shift was more hectic and that technicians on the night shift were expected to have more skills in different areas. While there may be a genuine factual dispute about whether the work on the night shift was more or less hectic or demanding, it still does not answer the fundamental argument made by MCI: "Porter hoped that he would have a better opportunity to progress more quickly by working closely with some of the better technicians who were on the mid shift." Porter testified that he transferred Freedman because he had more confidence in the night shift technicians' ability to train Freed-

man, who had not responded well to training on the day shift. Freedman presented no evidence to rebut this.

■ Freedman contends that, quite apart from the question whether he was assigned to the night shift for a legitimate reason, he was treated differently because he was forced to switch to the night shift without his acquiescence. In order to survive a summary judgment motion, a plaintiff must have more than a scintilla of evidence to support his claims. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Freedman has failed to meet this burden for establishing his contention that workers were not assigned to the night shift without their permission. Freedman marshals little evidence to show this fact. He cites one employee's affidavit attesting to the fact that Porter once asked him if he would work the night shift and did not assign him to the night shift when he refused. He also cites the deposition of Charles Moon. Moon describes an incident in which Jeff Porter told him that he needed to work the night shift and Moon agreed. However, Moon indicated that he interpreted Porter's statement to mean that he could have declined. Finally, he cites to the deposition of Jeffrey Spriggs, who said that Porter "usually works out the shifts according to your preference. And that at that time the needs of the business will warrant what we have to work." If anything, this final piece of testimony suggests that Porter made efforts to assign people the times that they desired, but that business needs may have trumped those desires. The other two pieces of evidence merely demonstrate that Porter offered workers a choice on distinct occasions. As a whole, they hardly rise to the level of demonstrating the existence of a policy against assigning people to the night shift against their wishes.

## B.

■ Freedman's claim that he was denied intensive one-on-one training given to other technicians is similarly flawed. MCI's training program relied heavily on hands-on training in which a newly hired NSE would learn by working with more experienced NSEs. Freedman claims that he was denied the training opportunities offered to other technicians because he was assigned to train with relatively inexperienced NSEs, David Swithers and Peter Carlin.

The district court found that the differences in training between Freedman and other technicians were " 'marginal distinctions with uncertain consequences' " that could not support a discrimination claim. *Freedman,* slip op. at 14 (quoting *Milburn v. West,* 854 F.Supp. 1, 14 (D.D.C.1994)). While a denial of training may rise to the level of an adverse employment action, *see Turlington v. Atlanta Gas Light Co.,* 135 F.3d 1428, 1436 n. 16 (11th Cir.1998); *see also* 42 U.S.C. § 2000e–2(d) (barring employers from discriminating in "admission to, or employment in, any program established to provide apprenticeship or other training"), we agree with the district court that there is insufficient evidence to demonstrate that Freedman was treated differently than his peers.

The essence of his claim is that he was assigned to less experienced NSEs for training. Swithers indicated that he joined MCI in October 1996, so he had about six months' experience when he began training Freedman. It is true that some other technicians were assigned to more experienced partners. LaTaryn Dexter, for one, was assigned to Gary Hobson, who had been with MCI for about twelve years. However, the evidence also shows that many of Freedman's peers were trained by NSEs who had about as much or less training than Swithers.

Swithers himself was trained by Philip Cofer when he started in October 1996. At that point, Cofer had been a NSE for a scant four months. Kent Rice was also trained by Swithers, but in March 1997, when Swithers had been employed for only four months. Sherry Porter, who joined MCI only a couple of weeks after Freedman was also trained by Swithers and reports that "[t]his training [was] extremely important to my being able to do my job."

Nor does the evidence support a claim that Freedman was hobbled by a training period shorter than those afforded to other NSEs. The other NSEs report training with another employee for times ranging from two weeks to four months. Sherry Porter, who was hired at about the same time as Freedman, reports that she trained for about a month, a span of time decidedly similar to the training period Freedman received from his hire date of May 12 to the date he started on the night shift, June 9. This, of course, does not even include the additional training that Freedman was expected to receive on the night shift.

## C.

■ In a similar vein, Freedman claims that he was denied the benefits of a mentorship program enjoyed by other MCI employees. The mentorship program was designed to provide additional training to new NSEs. Under the program, experienced engineers from other MCI locations visited the Washington terminal and assisted newer workers while more experienced technicians were occupied with other tasks.

Again, assuming that a training program is a condition or term of employment, Freedman has failed to demonstrate that he was treated differently with regard to this particular training program. Freedman reports that he received 10 to 15 hours of mentoring from Scott Huff during one week on the night shift. (He was evidently well enough satisfied by this experience that he sent an e-mail to Leo Smith, thanking him for the opportunity.) Both Sherry Porter and Kent Rice report that they were mentored for one week. There is nothing in either the Kent Rice or Sherry Porter affidavit to indicate that they spent eight hours per day with the mentor. Indeed, that would be a rather strange outcome in light of the unrebutted testimony by MacDonald to the effect that mentorships were not given to individuals, but that a mentor was essentially shared by whichever new NSEs were working on a particular shift. Because Freedman has failed to raise the necessary evidence of discriminatory treatment, his claim here fails.

## D.

■ There is likewise no way to conclude on this record that Freedman was treated differently regarding access to tools and computers. Freedman complained in the district court that MCI had violated Title VII "by (a) failing to provide plaintiff with a work station, [and] (b) failing to provide plaintiff with tools needed to perform his duties." Compl. ¶ 43. It seems beyond dispute that, when Freedman began work at MCI, he was not assigned a computer for his personal use. Freedman's claim of discrimination rests on his belief that everyone else was assigned a computer, and he was not.

However, in the context of the other evidence in the case, Freedman's mere belief that others were given access to computers while he was denied is insufficient for his claim to survive summary judgment. See *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1079–80 (D.C.Cir.1999). There is evidence of a shortage of computers on the day shift. Freedman himself

acknowledges that this shortage meant that some people were given access to computers and others were not. *Cf. Hall,* 175 F.3d at 1080 (where plaintiff did not even dispute existence of neutral policy explaining his treatment, employers explanation is "credible and unrefuted"). In essence, the MCI terminal appeared to operate as sort of a free market: those who had tasks to perform on a computer would wait until one became available, perform their tasks and move on to other business. The affidavits that Freedman submitted to support his complaint bear this out. Dexter and Rice both report that they had to share computer access during their initial training periods and beyond. Sherry Porter indicated that she shared her workstation until, like Freedman, she was transferred to the night shift. While MCI's approach to managing its employees and resources may have been less than ideal, all of the employees, Freedman included, operated under the same system. Since Title VII is designed to remedy discrimination, not poor management practices, Freedman has failed to provide evidence that would support a claim.

Though the question may be closer, the issue is essentially the same with tools. Freedman complains that other employees were assigned sets of tools and he was not. This is true to a point. Dexter, Rice and Swithers all report that they were assigned tools as soon as they were employed at MCI. However, it appears that this practice was haphazard: Jeff Porter testified that he "gave out tools when [he] could get them," but that he "couldn't really tell you who had tools and who did not have tools." Like Freedman, Sherry Porter indicated that she was initially not personally assigned a set of tools.

Much as it did with access to computers, MCI expected employees to share resources to complete tasks. Jeff Porter testified that "tools were available on the floor. One need only to open a desk drawer and you can usually find all the tools you need." Freedman's testimony on the matter is contradictory. In his affidavit, he contends that "I had difficulty in obtaining use of a computer, workstation, and tools from other employees" and that "[t]his interfered with my work...." However, in his deposition, he indicates that he was able to borrow the necessary tools from other employees (though sometimes with a wait). We need not resolve the contradiction, though. The evidence is clear that Sherry Porter, who was hired at roughly the same time as Freedman was not given her own set of tools until she had worked at MCI for three months. That Freedman was not personally assigned a set of tools in his first few months could hardly indicate that he was treated differently than his peers.

It is true that Freedman was not assigned a set of tools upon his return to MCI in October. However, by this point in his tenure with MCI, his assignments had changed. Though there appears to be some confusion about his actual assignment, Freedman was assigned to work either in a group called "install" or a group that was in transition from "install" to "maintenance." Though the record does not illuminate the differences between these groups of tasks, it is clear that while working on the daytime "install" task, Freedman would only occasionally need tools in order to perform wiring tasks. Work requiring such tools was generally performed at night. Thus, even assuming that Freedman was denied access to tools after he returned from his illness in October, the interference with his work was minimal, and could not rise to the level of an adverse employment action.

### E.

Freedman also complains that he was given inappropriate assignments—

"junk jobs" in his terms. Specifically, he claims that he was given special tasks—such as inventorying parts and teaching classes—not given to other workers. Assuming, as we must, the truth of this charge, we cannot say that he was unlawfully discriminated against. Quite simply, a temporary assignment to a less desirable task does not create liability under Title VII unless it results in a diminution in pay or benefits or affects such things as future employment opportunities "such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." *Brown*, 199 F.3d at 457. There is no evidence to suggest that Freedman was harmed by his temporary assignment to tasks he found unpleasant or undesirable, and "[m]ere idiosyncracies of personal preference are not sufficient to state an injury." *Id.*

### F.

■ Freedman's complaint that he received inadequate feedback similarly fails to rise to the level of demonstrating an adverse employment action. Freedman's complaint stems from the quarterly performance reviews that MCI employees received from supervisors. Porter reviewed Freedman's performance twice—once on July 15, 1997, and again on November 4, 1997. Freedman contends that both of these sessions were inadequate because Porter did not provide Freedman with adequate guidance or feedback regarding his job performance.

We agree with the district court that, even if Freedman's evaluations were less complete than those given his coworkers, those deficiencies could not constitute a sufficient change in the terms and conditions of his employment to support a claim. *See Freedman*, slip op. at 13–14. In *Brown*, we wrote that a negative performance evaluation did not rise to the level of an adverse employment action. *See Brown*, 199 F.3d at 458. It is hard to

fathom the logic that while a *poor* evaluation is not an adverse employment action, *no* evaluation is an adverse employment action. By themselves, Freedman's allegedly limited feedback sessions cannot be considered discriminatory changes in the terms or conditions of his employment.

### G.

■ Freedman's final specific complaint is that Jeff Porter exhibited a generally nasty attitude toward him while he worked for MCI. While Freedman does not say it in so many words, we take this as a traditional "hostile atmosphere" complaint. Of course, an employee may experience a work environment so tainted with hostility that the terms and conditions of employment may be considered changed. *See Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Often, determining whether an environment is sufficiently hostile is a difficult task. The appropriate standard "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.*

In this case, Freedman's evidence of religious hostility is limited. He cites a single explicit episode in which he alleges that Jeff Porter, after negotiating with a supervisor for a printer, said to Freedman that "Soon I'm going to be the only one at this terminal wearing a Yarmulka." Freedman took this as a religious slander. Even so, such a comment is insufficient to establish an atmosphere of hostility. As the Supreme Court has recently reminded us, a singular stray comment does not a hostile environment make. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 1510, 149 L.Ed.2d 509 (2001); *see also Faragher v. Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141

L.Ed.2d 662 (1998); *Park v. Howard Univ.*, 71 F.3d 904, 906–07 (D.C.Cir.1995).

Freedman's only other pieces of evidence are three statements of co-workers regarding Porter's behavior. In his statement of disputed facts, Freedman characterizes these statements as demonstrating that "Mr. Porter's treatment of plaintiff has been described by other NSE's [*sic*] as 'with indifference,' 'badly and exhibited a nasty attitude towards him,' and 'differently than other NSE's [*sic*].'" Plaintiff's Local Rule 108(h) Statement of Facts as to Which There Exists a Genuine Dispute ¶ 3. However, Freedman overstates the claims made by his fellow employees.

LaTaryn Dexter's affidavit indicates that Porter treated Freedman with "indifference," but gives an acceptably nondiscriminatory explanation for his behavior: "He seemed irritated with Mr. Freedman because he asked numerous questions." Likewise, Sherry Porter indicated that Jeff Porter treated Freedman "differently." However, Sherry Porter's statement deals not with the atmosphere of the terminal, but with the assignments that Freedman was given, an issue that we already discussed. Philip Cofer stated that "Mr. Porter treated Marshall Freedman badly and exhibited a nasty attitude towards him." A mere "nasty" attitude exhibited by a supervisor is insufficient to establish a hostile atmosphere, especially where, as here, there is no evidence that the "nasty" attitude is pervasive and constant. *See Phillips v. Taco Bell Corp.*, 156 F.3d 884, 890 (8th Cir.1998).

#### H.

█ Freedman claims that his discharge was the result of discrimination. He does not claim that the actual discharge was motivated by his religion. Rather, he claims that the collective impact of the various religiously-motivated slights he allegedly suffered was to ensure that he was a poorly-trained, under-performing worker ripe for discharge when MCI reorganized. We might be persuaded by this rationale, if there were evidence to support it. We have already established that there is insufficient evidence to establish that Freedman was subjected to different treatment regarding his transfer to the night shift, his training, his access to a mentor, his access to computers or his access to tools. The only remaining complaints are that he was given inadequate feedback and that he was given inappropriate assignments. Even if we accept Freedman's invitation to consider the "totality of the adverse actions" taken against him, we cannot see that the limited feedback and a few stray assignments would be sufficient to constitute adverse action which caused his dismissal.[1]

*Affirmed.*

---

1. We have considered and rejected Freedman's other arguments. They occasion no need for a written opinion. *See* D.C.Cir. R. 36(b).